**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

| | |
|---|---|
| JOANNE KENDALL,<br>　　　　　Appellant, | DOCKET NUMBER<br>AT-0752-18-0127-I-1 |
| 　　　v. | |
| DEPARTMENT OF DEFENSE,<br>　　　　　Agency. | DATE: May 1, 2024 |

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Nancy M. Kirby, Esquire, Prattville, Alabama, for the appellant.

Sterling Deramus, Esquire, Birmingham, Alabama, for the appellant.

Brandon Roby, Esquire, Fort Meade, Maryland, for the agency.

**BEFORE**

Cathy A. Harris, Chairman
Raymond A. Limon, Vice Chairman

**FINAL ORDER**

¶1　　The appellant has filed a petition for review of the initial decision, which dismissed her constructive removal appeal for lack of jurisdiction. Generally, we grant petitions such as this one only in the following circumstances:　the initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.　Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.　In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review. Therefore, we DENY the petition for review and AFFIRM the initial decision, which is now the Board's final decision. 5 C.F.R. § 1201.113(b).

## BACKGROUND

¶2 The appellant was a GS-12 Information Technology Specialist for the agency's Defense Intelligence Systems Agency (DISA). Initial Appeal File (IAF), Tab 15 at 23. When the appellant was initially hired in 2010, she worked the day shift, with duty hours of 7:00 a.m. to 3:00 or 4:00 p.m. IAF, Tab 15 at 25; Hearing Recording (HR), Track 1 at 4:45 (testimony of the appellant). In 2013, the appellant's office underwent a reorganization, and the agency moved her to the swing shift, with duty hours of 2:00 p.m. to 11:00 p.m. IAF, Tab 30 at 13-14; HR, Track 1 at 5:40 (testimony of the appellant). In May 2016, the appellant applied for leave under the Family and Medical Leave Act of 1993 (FMLA) in order to help care for her husband, who had been diagnosed with cancer, and the agency returned her to the day shift in order to help accommodate her schedule. IAF, Tab 30 at 16-17; HR at 6:20 (testimony of the appellant).

¶3 Sometime around December 2, 2016, the appellant's office underwent another reorganization, and the agency informed her that it was moving her back to the swing shift, Tuesday through Saturday, effective December 25, 2016. IAF, Tab 30 at 8, 10. On December 2, 2016, the appellant emailed her first- and

second-line supervisors, asking them to reconsider placing her on the swing shift. *Id.* at 8. The appellant cited her husband's health, anticipating that she would need to help care for him until at least the following April, as well as her own health, which she stated had been affected by her previous time on the swing shift.[2] *Id.* She stated that she would probably need to ask for a reasonable accommodation. *Id.* The appellant also included on the email the human resources Field Advisor who had been her point of contact regarding her FMLA, and stated that they needed to touch base regarding her FMLA status. *Id.* On December 12, 2016, the appellant submitted medical documentation to support her request for reasonable accommodation. IAF, Tab 12 at 5, Tab 14 at 40-42. Her claimed disabling condition was sleep apnea, and her requested accommodation was to be allowed to remain on the day shift. IAF, Tab 14 at 40-42.

¶4      The agency did not act on the appellant's request, and on December 25, 2016, her change to the swing shift went into effect. HR, Track 1 at 26:00 (testimony of the appellant). The appellant immediately began taking large amounts of leave in the evenings and on Saturdays so that she could get to bed earlier and care for her husband. *Id.* at 26:10, (testimony of the appellant). Around the middle of January 2017, the appellant ran out of paid leave and began to use leave without pay. HR, Track 1 at 29:20, Track 3 at 21:15, 32:10 (testimony of the appellant). On January 11, 2017, the appellant submitted a request to participate in the agency's Voluntary Leave Transfer Program (VLTP). IAF, Tab 8 at 29; *see* 5 C.F.R. § 630.901 (explaining that a VLTP allows for the transfer of the accrued, unused annual leave of one employee to another employee who needs such leave because of a medical emergency). Despite the appellant's further efforts during the following month, the agency never reached a decision on her VLTP or reasonable accommodation requests, although it did afford her an

_____

[2] In her email, the appellant refers to the swing shift as the "night shift." IAF, Tab 30 at 8.

interim accommodation by allowing her to begin her tour of duty 2 hours earlier. IAF, Tab 8 at 3, Tab 17 at 29. Then, on February 14, 2017, the agency informed the appellant that her FMLA approval would expire in 15 days if she did not provide updated information on her husband's medical condition. IAF, Tab 8 at 75. On February 24, 2017, the appellant tendered her resignation, effective February 27, 2017. IAF, Tab 5 at 23-24.

¶5 Having previously sought resolution through an equal employment opportunity (EEO) counselor, on March 13, 2017, the appellant filed a formal complaint of discrimination, which the agency processed as a mixed case because it involved a claim of constructive removal. IAF, Tab 28 at 5-11. The agency issued a final decision finding no discrimination, and the appellant filed the instant Board appeal. IAF, Tab 1 at 4, 6, 9-43. After a hearing, the administrative judge issued an initial decision dismissing the appeal for lack of jurisdiction on the basis that the appellant failed to prove that her resignation was involuntary. Initial Appeal File (IAF), Tab 139, Initial Decision (ID).

¶6 The appellant has filed a petition for review, arguing that the administrative judge applied the wrong standard to her appeal when she failed to analyze it as an involuntary disability retirement. Petition for Review (PFR) File Tab 1 at 9-10, 15-16. She argues that her resignation was involuntary because the agency unjustifiably failed to offer her a reasonable accommodation for her sleep apnea. *Id*. at 10-16. The agency has filed a response. PFR File, Tab 3.

## ANALYSIS

¶7 Although various fact patterns may give rise to an appealable constructive adverse action, all constructive adverse action claims have two things in common: (1) the employee lacked a meaningful choice in the matter; and (2) it was the agency's wrongful actions that deprived the employee of that choice. *Bean v. U.S. Postal Service*, 120 M.S.P.R. 397, ¶ 8 (2013). Assuming that the jurisdictional requirements of 5 U.S.C. chapter 75 are otherwise met, proof of

these two things is sufficient to establish Board jurisdiction. *Id.* Notwithstanding the broad similarity among all constructive adverse actions, proof of these elements may be established in different ways, depending on the type of case at issue. *See id.*, ¶¶ 9-10.

¶8        As the appellant correctly argues on review, chapter 75 jurisdiction may be established over a disability retirement if the agency unjustifiably refused to offer the employee a reasonable accommodation that would have allowed her to continue working.  PFR File, Tab 1 at 9-10; *see SanSoucie v. Department of Agriculture*, 116 M.S.P.R. 149, ¶ 15 (2011); *Nordhoff v. Department of the Navy*, 78 M.S.P.R. 88, 91 (1998), *aff'd*, 185 F.3d 886 (Fed. Cir. 1999) (Table). However, we disagree that the analysis in this appeal should be restricted to that applicable in disability retirement situations because the appellant did not, in fact, retire on disability.  She resigned.  IAF, Tab 5 at 23.  We note that we use the term "restricted" because that is just what the *Nordhoff* line of cases does; it restricts chapter 75 jurisdiction over disability retirements to situations in which reasonable accommodation was available.  *Okleson v. U.S. Postal Service*, 90 M.S.P.R. 415, ¶ 7 (2001).  Thus, even if we were to apply this standard to the appellant's case, it would not inure to her benefit.  Nevertheless, we understand the appellant's broader point that the administrative judge failed to make a sufficient analysis of her claim that her resignation was coerced by the agency's unjustified failure to accommodate her disability.  PFR File, Tab 1 at 10-16.  We address the appellant's claim under the jurisdictional standard for constructive adverse actions in general as set forth in *Bean*, 120 M.S.P.R. 397, ¶ 8.

¶9        Having thoroughly reviewed the record in this appeal, including the initial decision, the hearing recording, and the parties' documentary submissions, we recognize that there were multiple factors at play in the appellant's February 27, 2017 resignation.  Underlying everything were the appellant's extant medical condition of sleep apnea and her personal responsibilities of caring for her grandchildren and her sick husband.  IAF, Tab 14 at 41, Tab 30 at 8.

Compounding these difficulties was the appellant's return to the swing shift on December 25, 2016. IAF, Tab 30 at 8, 10; HR at 26:00 (testimony of the appellant). To deal with these difficulties, the appellant sought three distinct benefits from the agency: (1) Reasonable accommodation in the form of a return to the day shift, (2) FMLA leave to care for her husband, and (3) participation in the agency's VLTP to offset the financial difficulties that set in once her paid leave was used up. IAF, Tab 8 at 29, Tab 12 at 5, Tab 30 at 7. However, at the time of her resignation, the appellant had been unable to secure any of these benefits to her satisfaction.

¶10     Regarding the FMLA leave, the appellant had been working with the same human resources Field Advisor on FMLA matters related to her husband's medical condition since at least May of 2016. IAF, Tab 30 at 16. On December 2, 2016, after the appellant learned that she was being moved back to the swing shift, she sent an email to the Field Advisor, with copies to her first- and second-line supervisors, explaining the situation and stating that they would need to touch base again about her FMLA. IAF, Tab 30 at 8. On December 7, 2016, the appellant's first-line supervisor informed her that the Field Advisor was in the process of determining how much FMLA leave the appellant had used to date. *Id.* at 7. Subsequently, the appellant began using significant amounts of FMLA leave. IAF, Tab 8 at 36; HR, Track 1 at 26:10 (testimony of the appellant). On January 31, 2017, the appellant's first-line supervisor informed her that she would need to submit updated medical documentation for her husband to support continued FMLA status. IAF, Tab 8 at 68. On February 1, 2017, the appellant forwarded the Field Advisor the updated documentation. *Id.* at 67. Then, on February 13, 2017, the Field Advisor informed the appellant that she had reviewed the documentation, and although it was "difficult to determine what [was] being considered," there was enough information to approve FMLA up to March 6, 2017. *Id.* at 75. The Field Advisor posited that this would give the appellant some time to offer "more succinct

information" because the appellant's husband would have had additional diagnostic procedures and another doctor's visit during that time. *Id*. She notified the appellant that, if she were unable to submit updated documentation by March 6, 2017, her FMLA enrollment would expire. *Id*. Nevertheless, there is no indication that the agency ever denied the appellant any requested leave under the FMLA or otherwise prior to her resignation.

¶11 Regarding the VLTP, the appellant first notified the agency on January 11, 2017, that she was seeking to participate in the program, and that same day, the Field Advisor sent the appellant some information on the program and how to apply. IAF, Tab 8 at 29. It appears that the appellant first provided the requested information on February 1, 2017, in conjunction with the FMLA documentation discussed in the preceding paragraph.[3] IAF, Tab 16 at 22, Tab 30 at 67. The appellant resubmitted the information on February 9, 2017, and requested a status update. IAF, Tab 8 at 67, 70. The following day, the appellant's first-line supervisor informed her that the Field Advisor would need to approve her VLTP eligibility before management could sign the paperwork and the process could move forward. *Id*. at 72. Then, on February 13, 2017, the Field Advisor informed the appellant that her VLTP request could not be approved without further medical documentation specifying the nature of the medical emergency, the appellant's role in her husband's recovery, and the expected duration of the emergency. *Id*. at 74. The agency never affirmatively denied the appellant's request, but the appellant seems to have stopped making efforts toward it after this date.

¶12 Regarding reasonable accommodation, the record shows that the appellant first informed the agency that she would likely be seeking reasonable accommodation on December 2, 2016, although she did not specify the medical condition at issue or what accommodation she might be seeking. IAF, Tab 30

---

[3] The appellant relied on the same medical documentation to support her VLTP request and her FMLA request. IAF, Tab 8 at 67-68; HT, Track 4 at 8:45 (testimony of the appellant).

at 8. By December 8, 2016, the appellant became aware that the Disability Program Manager with DISA's Office of Equality, Diversity, and Inclusion (OEDI) was the appropriate point of contact for her reasonable accommodation request. IAF, Tab 16 at 5, Tab 30 at 7. The appellant submitted her request on December 12, 2016, including a note from her doctor stating that the appellant suffered from sleep apnea, which interfered with her ability to sleep and resulted in excessive tiredness at work and a danger in driving. IAF, Tab 12 at 5, Tab 14 at 40-42. The appellant's doctor recommended that, as an accommodation, the appellant should be allowed to work the day shift. IAF, Tab 14 at 41-42. Also attached was a release form for Federal Occupational Health (FOH) physicians to be able to discuss the appellant's medical condition with her doctor. *Id.* at 40. On December 16, 2016, the Disability Program Manager contacted the appellant's first-line supervisor to discuss her accommodation request. IAF, Tab 31 at 4-5. On Monday, December 19, 2016, the appellant's second-line supervisor informed her that management was supposed to have an update on her request status by the end of the week, and on Thursday, December 22, 2016, the Disability Program Manager informed the appellant that she had met with the first- and second-line supervisors, and that either she or management would provide the appellant with an update soon. *Id.* at 4.

¶13     It appears that nothing happened until January 6, 2017, when the Disability Program Manager sent an email to the appellant's first- and second-line supervisors, reminding them of the appellant's situation and of their obligation to participate in the interactive process. IAF, Tab 8 at 28. Management failed to respond, and on January 13, 2017, the Disability Program Manager emailed the appellant's first- and second-line supervisors again, reminding them that the reasonable accommodation process is time-sensitive and that they should make every effort to work with the appellant to reach a resolution as quickly as possible. *Id.* at 32. That same day, the appellant sent her first- and second-line supervisors an email requesting a meeting. *Id.* at 30. The appellant's first-line

supervisor responded, informing the appellant that she was still awaiting OEDI's official decision on the appellant's request for reasonable accommodation. *Id.* at 34. The supervisor mentioned two potential day shift positions, which they had apparently discussed before, and she set up a meeting for the following week. *Id.*

¶14 The appellant met with her first- and second-line supervisors on January 17, 2017. IAF, Tab 10 at 8; HR, Track 1 at 31:20 (testimony of the appellant). They expressed to her that there were, indeed, two day shift positions that she might move into, but that they were still awaiting a final decision from OEDI as to whether the appellant satisfied the requirements for receiving a reasonable accommodation. IAF, Tab 10 at 8. On January 25, 2017, the appellant and her attorney met with the Disability Program Manager and another OEDI official, who apparently offered the appellant one of the two day shift positions, which the appellant agreed to accept, pending a written job description, including salary and duty hours. IAF, Tab 8 at 36. The following day, the Disability Program Manger apprised the appellant's first- and second-line supervisors of the meeting and notified them of the appellant's tentative acceptance of one of the day shift positions. *Id.* at 5. She also noted that there was an outstanding medical question regarding the safety of the appellant's driving. *Id.* The appellant's first-line supervisor responded, asking why the agency would be willing to accommodate the appellant in light of her FMLA leave usage, especially on the weekends, and the difficulty of fully staffing a 24/7 office under those circumstances. *Id.* at 4-5. She questioned whether it might be more appropriate to find the appellant a position in another office that might be better able to accommodate her needs. *Id.* at 5. She did agree, however, that the agency should engage FOH to determine why it was safe for the appellant to drive to and from the day shift, but not to and from other shifts. *Id.* at 5. The Disability Program Manager responded, informing the first-line supervisor that an employee is entitled to use FMLA and reasonable accommodation simultaneously, and that reasonable accommodation cannot be denied on the basis

that the employee has been approved for FMLA. *Id.* at 4. She stated that the appellant's use of leave on weekends was a separate issue from reasonable accommodation. *Id.*

¶15 On January 27, 2017, the appellant's attorney emailed the Disability Program Manager, asking for the written information on the day shift positions. *Id.* at 42. On January 30, 2017, the Disability Program Manager inquired of management whether they had forwarded this information to the appellant. IAF, Tab 27 at 37. The appellant's first-line supervisor responded, stating that she was "not comfortable" providing the appellant position descriptions to choose from for the same reasons she stated previously, and again suggested that OEDI should broaden its search to find another position in another office that would be a better fit. *Id.* She also expressed that there was still an outstanding question about the safety of the appellant's driving, and that, at a more basic level, she would want to have a clearer understanding of the nature, duration, and severity of the appellant's sleep apnea, as well as an explanation of the activities that it affects. *Id.*

¶16 On February 1, 2017, the appellant's attorney again asked the Disability Program Manager for the details of the two day shift positions. IAF, Tab 8 at 49. On February 3, 2017, the Disability Program Manager sent the appellant's first-line supervisor a lengthy email, stating that the agency could only engage FOH if the appellant signed a waiver,[4] advising that the agency had the opportunity of offering the appellant a temporary accommodation, apparently disagreeing that the appellant had not provided medical documentation sufficient to satisfy the first-line supervisor's concerns, stating that the appellant was entitled to receive information about the positions being offered or considered as accommodations, and stating that, although management could search outside the appellant's office for an accommodation position, the appellant's weekend leave

---

[4] The Disability Program Manager apparently overlooked the FOH waiver that the appellant had already executed in December. IAF, Tab 8 at 40.

was not related to her disability and was therefore not a reasonable accommodation matter.  IAF, Tab 124 at 5-6.

¶17        Having received no response thus far, on February 9, 2017, the appellant's attorney sent the agency a final email requesting further written information about the two day shift positions.  IAF, Tab 8 at 58.  The following day, February 10, 2017, the appellant's first-line supervisor sent the appellant an email, informing her that she must provide medical documentation in response to twelve specific questions because the medical documentation that she submitted on December 12, 2016, was insufficient to determine whether she was a qualified person with a disability, what job functions were impaired, and how her "alleged" sleep apnea affects her differently during the day than at night.  *Id.* at 2-3.  She offered the appellant a temporary accommodation of a 2-hour earlier start to her swing shift, which the appellant accepted, but the appellant resigned without providing the additional requested medical documentation.  IAF, Tab 8 at 3, Tab 17 at 29.

¶18        Combined with the underlying stressors related to her personal health, her husband's health, her familial responsibilities, and her return to the swing shift, we find that the appellant was under significant pressure in February 2017, related to her requests for benefits under the FMLA, VLTP, and Americans with Disabilities Act (ADA).  Although the pressure had been building for some time, it appears to have come to a head on February 10 and 13, 2017, when the agency informed her that her documentation on record was insufficient to support any of her requests.  Considering the facts as set forth above, we find that some of this was due to the agency's wrongdoing, and some of it was not.  The difficulties inherent in the appellant's caregiving responsibilities were not due to the wrongdoing of the agency.  Nor is there any reason to believe that the agency's decision in late 2016 to return the appellant to the swing shift was improper.[5]

---

[5] Although it appears that the agency may have placed the appellant on the day shift in May 2016 to accommodate her caregiving situation, HR at 6:20 (testimony of the appellant), neither the FMLA nor the ADA would have required it to do so.  The FMLA

¶19     As for the appellant's request under the FMLA, we find no wrongful agency action here either.  There is no record of the agency requesting updated medical documentation between May 2016 and January 31, 2017, and there was nothing improper about the agency requiring updated medical documentation at that point.  In fact, the law specifically authorizes the agency to request updated documentation every 30 days.  5 C.F.R. § 630.1208(a), (j).  There is no reason to believe that the agency was attempting to harass the appellant or was otherwise acting in bad faith by requiring her to update her information more than 7 months after FMLA leave had been initially approved.  Nor is there any evidence that would support a finding that the appellant's February 1, 2017 medical documentation was sufficient to meet the medical certification requirements of 5 C.F.R. § 630.1208(b), or that the Field Advisor was incorrect that additional information was required.[6]  We further find that, although nearly 2 weeks had elapsed between the appellant's submission of FMLA documentation on February 1, 2017, and the February 13, 2017 notification that the documentation was deficient, the delay was not excessive, the appellant was not prejudiced by it, and the agency showed good faith in allowing her an additional 15 business days to submit further documentation.  IAF, Tab 8 at 75.

¶20     Likewise, with the appellant's request under the VLTP, there is no evidence to support a finding that the documentation that she submitted with her February 1, 2017 application was sufficient.  Neither the documentation itself nor the agency's requirements appear to be contained in the record.  *See* 5 C.F.R. § 630.904(b) (setting forth the requirements for a VLTP leave recipient's application, and allowing employing agencies to set forth additional

pertains to leave, and not to schedule adjustments, *see* 5 U.S.C. § 5382; 5 C.F.R. § 630.1203, and the ADA does not prescribe accommodations for employees in their capacity as caregivers, *see Jordan v. Department of Defense*, EEOC Appeal No. 0120055250, 2006 WL 3877372, at *6 (Dec. 28, 2006).

[6] The medical documentation that the appellant submitted on February 1, 2017, does not appear to be contained in the voluminous record in this appeal, and if it does, the parties have not identified its location.

requirements). Again, as with the FMLA matter discussed above, we find that 2 weeks was not an excessive amount of time for the agency to make a determination and to notify the appellant that additional information was required. IAF, Tab 8 at 74. It appears that the Field Advisor carefully reviewed and considered the appellant's application and tried to advise her on what further information she needed to submit. We see no negligence, bad faith, or other malfeasance in the agency's handling of the appellant's VLTP request.

¶21    The appellant's reasonable accommodation request, however, is a different matter. Although the appellant submitted her reasonable accommodation request on December 12, 2016, for more than a month, nothing whatsoever happened except for internal discussions between management and OEDI, and empty promises from the agency that the appellant would have an answer soon. IAF, Tab 8 at 28, 32; Tab 31 at 4-5. It appears that the appellant's case was stuck in limbo because OEDI and management were both waiting for the other to do something before they proceeded. IAF, Tab 8 at 28, 32, 34. The first time the appellant's supervisors actually met with her was January 17, 2017, when they informed the appellant that management was waiting on OEDI to render an official decision on the appellant's qualification for accommodations. IAF, Tab 10 at 8. What happened next was that OEDI offered the appellant one of two day shift positions (an offer that it was apparently not authorized to make), followed by more agency infighting about the proper course of action. IAF, Tab 8 at 4-5, 36, 42, 46, Tab 27 at 37, Tab 124 at 5-6; HR, Track 7 at 10:30 (testimony of the appellant's first-line supervisor). While this was going on for 2 weeks, the appellant was shut out of the process completely, believing the entire time that the only thing left to resolve was the position description, but that management was stonewalling her on this relatively simple matter. IAF, Tab 8 at 42, 49, 58. Then, it would appear that the disagreements between the appellant's first-line supervisor and the Disability Program Manager resulted in a fracture, whereupon the first-line supervisor took matters into her own hands and notified

the appellant for the first time that the medical documentation that she submitted 2 months prior was deficient. IAF, Tab 8 at 2-3. Whoever was right about the whole thing, the first-line supervisor or the Disability Program Manager, it matters not. Either way, the agency bungled this badly. It spent almost the entire time occupied with internal miscommunications and interoffice disputes, cutting the appellant out of this supposed "interactive process" as much as possible, until nearly 2 months after she started, she found herself nearly back to square one.[7] We find that the agency's handling of this matter was improper.

¶22     Considering all of the evidence together, we find that the appellant's resignation was precipitated by several factors, some of which were the result of wrongful agency actions and some of which were not. *Cf. Bean*, 120 M.S.P.R. 397, ¶ 8. Nevertheless, in the final analysis, we agree with the administrative judge that this case turns on the voluntariness element, i.e., whether the appellant had a meaningful choice in her resignation. ID at 12-13. We further agree with the administrative judge that the appellant failed to establish this element. ID at 12-13.

¶23     We acknowledge that the agency's mishandling of the appellant's reasonable accommodation request must have been very frustrating and caused her a great deal of distress and trouble. However, we do not find that this matter would have been sufficient to compel a reasonable person to resign her position at the time the appellant did. *See Gregory v. Federal Communications Commission*, 79 M.S.P.R. 563, ¶ 8 (1998) (finding that the ultimate question on voluntariness is whether a reasonable person would have felt compelled to resign under the circumstances). This is especially so considering that the appellant's supervisor was finally beginning to engage with her in the interactive process in a meaningful way, to include the offer of a temporary, partial accommodation, as

---

[7] Although there are exceptions, the reasonable accommodation process at DISA typically takes less than 30 days, consistent with the written requirements of DISA's reasonable accommodation procedures. IAF, Tab 44 at 9; HR, Track 5 at 58:35 (testimony of the Disability Program Manager).

well as specific instructions on the type of medical documentation that she needed to submit. IAF, Tab 8 at 2-3. As for the FMLA and VLTP matters, as explained above, we find that the agency did not mishandle them in any way. *Supra* ¶¶ 19-20. Although it must have been disappointing for the appellant to have submitted paperwork, only to be told 2 weeks later that it was deficient, we find that this situation is not beyond the realm of expectation and would not have contributed significantly to a reasonable person's resignation.

¶24    Apart from these matters, as the administrative judge noted, the appellant testified repeatedly that she resigned because she was "scared" and that she believed she was being set up to be fired. ID at 9 & n.13; HR, Track 1; at 57:00, Track 3 at 9:45 (testimony of the appellant). She was also laboring under the mistaken belief, through no fault of the agency, that she was an "at will" employee, i.e., an employee who can be fired without cause. HR, Track 1 at 1:00:40, Track 4 at 29:40 (testimony of the appellant). Based on the appellant's testimony, this factor appears to have played a major, if not the decisive, role in her resignation. In fact, the appellant testified that she could have continued working the swing shift at the agency but for the fact that she was about to get fired. HR, Track 2 at 1:06:30 (testimony of the appellant). We find that this fear would not have motivated a reasonable person to resign because there is no evidence that the agency either threatened or proposed any disciplinary action against the appellant. She has simply identified no basis for her belief that management was getting ready to fire her. To the extent that the appellant's belief that she was an at will employee played into her fears, we find that this was unreasonable as well because the appellant's employment was governed by Federal law, not State law, and she could only have been removed from her position for cause, with 30 days' advance written notice and an opportunity to respond.[8]    *See* 5 U.S.C. § 7513(a)-(b). In addition, as the

---

[8] Even if the appellant were facing removal, her decision to resign rather than oppose the adverse action would still be voluntary. *See Baldwin v. Department of Veterans Affairs*, 109 M.S.P.R. 392, ¶ 12 (2008).

administrative judge accurately noted, on February 11, 2017, the appellant sent an email to her first-line supervisor strongly suggesting that her forthcoming resignation was more about work-life balance than any of the matters discussed above. IAF, Tab 65 at 19. The appellant does not dispute this finding on review.

¶25 Considering the record as a whole, we find that, although the appellant's resignation was precipitated in part by the agency's wrongful actions in connection with her reasonable accommodation request, the combined circumstances were not of the nature and severity that would have made a reasonable person in the appellant's situation believe that she had no realistic alternative but to resign. Although a reasonable person might have felt that resignation was her best option, she would not have felt that it was her only option. *See Lawson v. U.S. Postal Service*, 68 M.S.P.R. 345, 350 (1995) (finding that the fact that an employee is faced with an inherently unpleasant situation or that her choices are limited to unpleasant alternatives does not make her decision involuntary). We therefore find that the appellant's resignation was not involuntary and that she has not established jurisdiction over her resignation as a constructive removal under 5 U.S.C. chapter 75.[9]

## NOTICE OF APPEAL RIGHTS[10]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit

---

[9] Because the appellant raised a claim of disability discrimination in this constructive removal appeal, and the Board has now issued a Final Order dismissing the appeal for lack of jurisdiction, the agency is required, under Equal Employment Opportunity Commission (EEOC) regulations, to reissue a notice under 29 C.F.R. § 1614.108(f) giving the appellant the right to elect between a hearing before an EEOC administrative judge and an immediate final decision. *See* 29 C.F.R. § 1614.302(b).

[10] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at

http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

(2) **Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case,

and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) <u>Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012</u>**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[11]  The court of appeals must <u>receive</u> your petition for

---

[11] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195,

review within **60 days** of the <u>date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

---

132 Stat. 1510.

21

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD:

*Gina K. Grippando*

_____
Gina K. Grippando
Clerk of the Board

Washington, D.C.